IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE

Assigned on Briefs November 18, 2025

**STATE OF TENNESSEE v. ESAU CALEB KELLY**

**Appeal from the Criminal Court for McMinn County**
**No. 22-CR-200       Andrew M. Freiberg, Judge**

_____

**No. E2024-01167-CCA-R3-CD**

_____

The Defendant, Esau Caleb Kelly, was convicted of voluntary manslaughter, attempted second-degree murder, employment of a firearm during commission of a dangerous felony, and reckless endangerment by discharge of a firearm into an occupied habitation, for which he received an effective sentence of 24 years. The sole issue raised on appeal is whether the trial court erred in affirming the jury verdict for the attempted second-degree murder conviction and reckless endangerment by discharge of a firearm into an occupied habitation conviction. Upon our review, we affirm the judgments of the trial court.

**Tenn R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

CAMILLE R. MCMULLEN, J., delivered the opinion of the court, in which ROBERT W. WEDEMEYER, P.J., and MATTHEW J. WILSON, J., joined.

Wesley D. Stone, Knoxville, Tennessee (on appeal); Alan R. Beard, Chattanooga, Tennessee (at trial), for the appellant, Esau Caleb Kelly.

Jonathan Skrmetti, Attorney General and Reporter; Park Huff, Assistant Attorney General; Shari Lynn Tayloe, District Attorney General; and Matthew Dunn, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

On September 18, 2021, the Defendant, Melissa Pruitt, and Hayden Moses drove to the trailer home of Mary Dalton ("Mother") and her son, Jonathan Burger, the victims in this case. Moments later, the Defendant fatally shot Mother and wounded Burger, causing serious injury to Burger's leg. For his actions, on May 17, 2022, the McMinn County Grand Jury indicted the Defendant for second-degree murder, attempted second-degree

murder, unlawful employment of a firearm during the commission or attempted commission of a dangerous felony, and reckless endangerment.

The Defendant's two-day jury trial began on October 3, 2023. Below is a summary of the proof as relevant to the issues raised in this appeal.

Deputy Caleb Latham was a patrol deputy for the McMinn County Sheriff's Office in 2021. On the night of the offense, Deputy Latham was dispatched to Mother's home. Deputy Latham testified that, when he arrived at the scene, he saw Mother lying in the front yard of the home while two officers attended to her. Deputy Latham then proceeded inside the home and saw Burger lying in the hallway with "blood all around his lower body." He stated that Burger appeared to be in pain and was "curled up in . . . a fetal position." Deputy Latham asked Burger where he had been shot, and Burger replied that his "leg was blowed [sic] off." Deputy Latham then applied a tourniquet to Burger's leg to stop the bleeding. Shortly after, Emergency Medical Service ("EMS") personnel arrived and took Burger to the hospital. After Burger was taken away from the scene, Deputy Latham began assisting with gathering evidence and taking photographs of the scene. He noticed that there were several bullet holes throughout the home and collected spent shell casings in the driveway outside the home as evidence. Deputy Latham described the shell casings as "an assault rifle round" related to either an AK-47 or SKS. After collecting evidence, Deputy Latham continued to secure the scene.

On cross-examination, Deputy Latham stated that Burger appeared to have been shot while inside of the home because "there was no blood leading from outside [of the home] in." Deputy Latham stated that Burger "looked like he wasn't able to move" because he appeared to be in "very bad pain." However, he also stated, "[W]hen a person is in pain, you don't know what you're capable of[,] so I can't, I'm not for sure." Deputy Latham stated that, while searching the home for evidence, he did not find any weapons; however, he did find drug paraphernalia inside the home.

Michael Wilcox, Burger's neighbor, testified that on the night of the offense, he saw a "bluish"-colored car "fl[y] in" the neighborhood and go toward Mother's home. Within seconds, Wilcox heard over twenty gunshots. After the gunshots, the car speed away so quickly that Wilcox thought "they were going to end up in [his] yard." Wilcox said that he was able to see that there were three individuals in the car—one male and two females. However, he did not recall anything specific about the male for identification purposes and did not see where in the car the three individuals were sitting because "it was dark" and "by the time [he] jumped out on [his] porch, they [were]. . . flying up the road." Wilcox called 911 and headed toward the scene.

When Wilcox arrived at the scene, he saw Mother lying on her back in the front yard. Jeremy Wattenbarger, Mother's youngest son, was already at the scene and had begun giving CPR to Mother. Wattenbarger asked Wilcox to go inside the home and check on Burger. When Wilcox stepped inside the home, he saw Burger lying on his side in the hallway and noticed that Burger had been shot in the leg. After checking on Burger and confirming that he was "hurt, but he was okay," Wilcox went back outside to help Mother until the police arrived. Wilcox explained that he did not tell Wattenbarger that he had seen a car speeding from the scene because Wattenbarger was focused on assisting Mother.

On cross-examination, Wilcox said that he saw Burger and Haley Moses walking up and down the street earlier that day. When defense counsel asked if Wilcox saw Burger "dragging [Moses] by her hair" as they were walking down the street, Wilcox asserted that he did not and had never seen Burger be physically violent with Moses.

Wattenbarger testified that at the time of the offense he was living with his grandmother. Mother's home was located directly behind his grandmother's house. On the day of the offense, Wattenbarger had been "hanging out" with Mother at her home and had stayed there for most of the day. About five minutes after leaving her house, he heard a rapid series of noises—"boom, boom, boom, boom, boom, boom, boom[.]" At first, Wattenbarger thought someone was hitting the side of the screened-in porch, but he soon realized the sounds were gunshots. He ran outside and saw Mother lying on her back in her front yard, approximately 50 to 60 yards away. When he reached her, he saw that she had been shot in the legs. Wattenbarger explained that at first, he believed Mother had simply fallen after being shot and had been "knocked out[.]" Once he realized she was not breathing, he began performing CPR and screamed for help. He continued administering CPR until the police arrived.

After the police arrived and took over providing aid to Mother, Wattenbarger went inside the house and saw Burger lying in the hallway, bleeding. He observed that Burger was in significant pain and that there was a large amount of blood in the hallway. Wattenbarger stated that Burger was in no condition to be walking around.

Wattenbarger testified that when he first arrived at the scene, he saw a dark-colored car with three silhouettes inside it. Wattenbarger stated that, because it was dark, he could only make out the silhouettes of three people in the car, not their identities. On cross-examination, defense counsel pointed out a discrepancy in Wattenbarger's testimony and what he told the police on the night of the incident. On the night of the offense, Wattenbarger told police that he had specifically seen the Defendant driving the car, with Melissa Pruitt in the front passenger seat and Hayden Moses in the back. Wattenbarger admitted that his recollection had changed from identifying three specific individuals to now stating that he saw only silhouettes. Wattenbarger explained that on the night of the

offense, he asked Burger who had killed Mother, and Burger responded, "[Moses]'s mom and her boyfriend[,] [the Defendant]." After speaking to Burger, Wattenbarger concluded the silhouettes were the Defendant, Pruitt, and Moses.

Wattenbarger testified that his grandmother's home had security cameras that captured the events from the night of the offense. He was shown two videos from these cameras, which were admitted as exhibits. He explained that one video came from a camera positioned "on the front corner of the house facing the road[.]" In the upper-right portion of the footage, he saw headlights from a dark-colored car. In a second clip, he observed the dark-colored car speeding away from the scene at what he described as an "excessive speed." Approximately two minutes passed between the car traveling toward the scene and driving away. Wattenbarger confirmed that the car shown in the video was the same one he saw at the scene that night. In another video from behind his grandmother's home, Wattenbarger stated that Mother's home can be seen in the upper left-hand corner of the video. Wattenbarger described headlights shining on Mother's home, followed by a sudden "flash of light."

Jonathan Burger testified that, at the time of the shooting, he was living with Mother and his girlfriend, Moses. Burger stated that he and Moses had been in a relationship for about five years; however, he described their relationship as "rocky" and stated that they "fought quite a bit." On the day of the offense, Burger and Moses were fighting "most of the morning into mid-evening," but the argument had stopped by that night. Later that evening, Burger saw a black Ford Escape arrive at Mother's home and recognized the car as belonging to Pruitt, Moses's mother. Burger went outside after seeing the Defendant standing in the front yard. He positioned himself about five feet from his porch, into the front yard, and told the Defendant to get back in his car. Burger acknowledged that he spoke to the Defendant in a "heated" manner. Mother then told Burger to go back inside the home. As he began to reenter the home, Burger took "about two steps in the door" before he was shot. Burger stated that it felt like his "feet were blown out from underneath [him]." He fell backward out the door, landing on his back. While lying on the ground, Burger saw the Defendant shoot Mother in her legs. Mother attempted to run back inside the home, but fell in the yard, at which point the Defendant shot her again in the back. After witnessing this, Burger "jumped back up" to escape, but "[his] leg gave out and [he] fell down [in] the hallway." After the second fall, he could not stand up again.

Burger was taken to UT Medical Facility and suffered from a gunshot wound to the leg. He was hospitalized for eight days and underwent multiple surgeries. While recovering, Burger was ordered to bedrest and was told that "it would take six to eight months before [his] leg would heal to where [he] could start putting pressure on it." Burger stated that, even two years after the shooting, he continues to be in pain and has had multiple infected wounds that "leak[] really bad."

- 4 -

While at the hospital, Burger gave a statement to Detective Dillon Presswood about the events of that evening. Burger told Detective Presswood that he had "cussed" and "lunged" at the Defendant during the encounter. On cross-examination, Burger admitted that this statement conflicted with his later preliminary hearing testimony, where he denied "hav[ing] words" with the Defendant and denied lunging at him. At trial, Burger maintained that he stayed five to ten feet away from the Defendant and never lunged at him. When asked why he told Detective Presswood that he lunged at the Defendant if he did not, Burger responded, "After my surgery, I was very intoxicated on pain meds and wasn't thinking clearly, sir."

Detective Presswood testified that he was called to the scene that night in response to a shooting and a possible homicide. Upon arrival, Detective Presswood noticed that Mother's home was "riddled with bullet holes." Detective Presswood stated that there was also "quite a bit of blood" on the front porch and just inside the home. Detective Presswood was shown a series of photographs of the home after the offense, which were admitted as exhibits. From the photographs, Detective Presswood described several areas of the home, both inside and outside, that had been struck by bullets. Other photographs also showed two areas with a large amount of blood on the floor of the home. Detective Presswood described the first area with blood to be inside the home, "as soon as [he] walked in the door." The other area, which Detective Presswood described as the primary location of blood, was in the hallway where Burger was found laying. Detective Presswood stated that the blood spots from the front door and the hallway were only a couple feet apart.

Detective Presswood gathered evidence from the outside of the home, and he collected fourteen spent shell casings from the driveway, front porch, and front yard of the home. Detective Presswood stated that the shell casings were common to an AK-47. When asked whether he had a lead in his investigation at this point, Detective Presswood stated that responding officers had determined the Defendant to be a possible suspect. Detective Presswood explained that the responding officers used social media to look up the Defendant and noticed that the Defendant's profile photograph included a picture with two guns—one of which was an AK-47. Detective Presswood described the profile photograph as follows:

> His profile or cover photo or whatever it's called, on the front of it you can see two, looks to be up here, two Star Wars Yoda dolls. And then under those dolls, it looks like those dolls are actually holding guns. One of those guns is a black, which appears to be a Glock pistol. The other one would be a black in color AK-47 style pistol as well.

- 5 -

Detective Presswood searched the home of Pruitt and found two Star Wars Yoda dolls, consistent with the dolls in the Defendant's social media post. Detective Presswood also identified a receipt found in Pruitt's purse from the Tennessee Valley Credit Union for the withdrawal of thirty-five dollars at 8:17 p.m. on the night of the offense. Detective Presswood was shown surveillance video from Tennessee Valley Credit Union, which was admitted as an exhibit, and identified Pruitt and a "Black, Ford SUV type vehicle" in the video.

On cross-examination, Detective Presswood acknowledged that Burger stated that he was shot at the front door of the home, then fell and began trying to retreat. Detective Presswood agreed that Burger never mentioned falling on the porch or standing up after being shot.

Jared Price, a detective with the McMinn County Sheriff's Department, testified that he searched the Defendant's home and found two Glock firearms in the home. In the Defendant's nightstand drawer, Detective Price also found 7.62 caliber ammunition, consistent with the shell casings found at the scene. On cross-examination, Detective Price acknowledged that the firearms found at the Defendant's home were legally owned.

Hayden Moses, Burger's girlfriend, testified that she had been residing with Burger and Mother for three years at the time of the incident. Moses stated that she did not remember most of the time living there because she was "messed up, blasted" everyday. She admitted that, on the day of the offense, she was "pretty high" because she had taken fentanyl with Burger, Mother, and Wattenbarger. Moses stated that she was told about the shooting the day after the incident and asserted that she had no prior knowledge of it until then.

Moses stated that she had spoken to Burger after the shooting and, initially, Burger told her that he did not know who shot him. However, Burger also told her that "he had had an argument with Lakota or David Rodriguez over a phone. And that he thought that might have been at the moment who shot his mother." When asked how the Defendant's name came up, Moses asserted that Burger's neighbor, Wilcox, and Burger's brother, Wattenbarger, said that the Defendant was the shooter. Moses maintained that Burger never told her that he knew who shot him.

On cross-examination, Moses acknowledged that her fentanyl use had left her in a "five-year haze" during which she "does not really remember anything." When asked whether she recalled taking drugs with Burger, Mother, and Wattenbarger on the day of the offense, Moses responded, "It was an everyday thing. We were addicts." When asked whether she had actual recollection of using drugs on that specific day, she stated that she

did not. She further clarified that she had no specific memory of the events of that day, only that she used drugs daily.

At the conclusion of trial, the jury convicted the Defendant of the lesser included offense of voluntary manslaughter (Count 1), attempted second-degree murder (Count 2), employment of a firearm during commission of a dangerous felony (Count 3), and reckless endangerment by discharge of a firearm into an occupied habitation (Count 4). Following a sentencing hearing, the trial court imposed consecutive terms of six years for the voluntary manslaughter conviction, twelve years for the attempted second-degree murder conviction, and six years for the employment of a firearm during commission of a dangerous felony conviction, and a concurrent term of three years for the reckless endangerment by discharge of a firearm into an occupied habitation conviction, for an effective sentence of twenty-four years.

Thereafter, the Defendant timely filed a motion for a new trial, which was denied by the trial court. This timely appeal followed.

## ANALYSIS

The Defendant argues that the trial court erred in affirming the verdicts for the attempted second-degree murder charge and reckless endangerment by discharge of a firearm into an occupied habitation charge because they are against weight of the evidence presented at trial. Specifically, he asserts that the two eyewitnesses, who identified the Defendant as the perpetrator, were "shown to be liars, and their testimony should have carried no weight at trial." In response, the State contends that the credibility of the witnesses and their testimony are jury determinations and must not be disturbed on appeal. We agree with the State.

Initially, we must address the Defendant's claim that the jury's verdict was contrary to the weight of the evidence in this case. Tennessee Rule of Criminal Procedure 33(d) states that "[t]he trial court may grant a new trial following a verdict of guilty if it disagrees with the jury about the weight of the evidence." Tenn. R. Crim. P. 33(d); see State v. Carter, 896 S.W.2d 119, 122 (Tenn. 1995) (holding that the trial court has a duty to serve as the thirteenth juror). Only if the record contains statements by the trial judge indicating disagreement with the jury's verdict or evidencing the trial judge's refusal to act as the thirteenth juror may an appellate court reverse the trial court's judgment. Id. Otherwise, appellate review is limited to the sufficiency of the evidence pursuant to Rule 13(e) of the Tennessee Rules of Appellate Procedure. State v. Burlison, 868 S.W.2d 713, 718-19 (Tenn. Crim. App. 1993). If the reviewing court finds that the trial judge has failed to fulfill his or her role as thirteenth juror, the reviewing court must grant a new trial. State v. Moats, 906 S.W.2d 431, 435 (Tenn. 1995). Here, the record clearly shows that the trial

court agreed with the jury's verdict as the thirteenth juror. The transcript shows the trial court explicitly stated, "I will approve of and affirm the decisions and judgments of the jury in this case." Accordingly, we conclude that the trial court fulfilled its role as thirteenth juror and our review is limited to the sufficiency of the evidence pursuant to Rule 13(e).

The sole remaining issue is whether the evidence was sufficient to support the Defendant's convictions of attempted second-degree murder and reckless endangerment by discharge of a firearm into an occupied habitation. See Tenn. Code Ann. § 39-13-210, -103(b)(3). In challenging his identity as the perpetrator of the offense, the Defendant attacks the credibility of the State's eyewitnesses, Burger and Wattenbarger, and claims that both witnesses were "shown to be liars, and their testimony should have carried no weight at trial." He contends that Burger's testimony that, after being shot and immobilized, he was able to stand up and see the shooter "lacks any credibility of logic." The Defendant also contends that the evidence revealed "other lies [Burger] was caught in," including his denial that he lunged at the Defendant despite having told Detective Presswood otherwise, as well as Moses's testimony that Burger told her he did not know who shot him and initially believed it was someone else. Furthermore, the Defendant contends that Wattenbarger's testimony is not credible due to the inconsistency between his police statement—where he reported seeing the Defendant, Pruitt, and Moses—and his trial testimony, in which he stated that he saw only three dark silhouettes. The State contends, and we agree, that the evidence was sufficient to support the Defendant's convictions in this case.

When a defendant challenges the sufficiency of the evidence, the standard of review applied by this court is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979) (emphasis omitted). "Because a verdict of guilt removes the presumption of innocence and raises a presumption of guilt, the criminal defendant bears the burden on appeal of showing that the evidence was legally insufficient to sustain a guilty verdict." State v. Hanson, 279 S.W.3d 265, 275 (Tenn. 2009) (citing State v. Evans, 838 S.W.2d 185, 191 (Tenn. 1992)). The State, on appeal, is entitled to the strongest legitimate view of the evidence and all reasonable inferences which may be drawn from that evidence. State v. Davis, 354 S.W.3d 718, 729 (Tenn. 2011) (citing State v. Majors, 318 S.W.3d 850, 857 (Tenn. 2010)). Guilt may be found beyond a reasonable doubt where there is direct evidence, circumstantial evidence, or a combination of the two. State v. Sutton, 166 S.W.3d 686, 691 (Tenn. 2005); State v. Hall, 976 S.W.2d 121, 140 (Tenn. 1998). The standard of review for sufficiency of the evidence "'is the same whether the conviction is based upon direct or circumstantial evidence.'" State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting Hanson, 279 S.W.3d at 275).

In determining the sufficiency of the evidence, appellate courts do not reweigh or reevaluate the evidence. State v. Smith, 436 S.W.3d 751, 764 (Tenn. 2014) (citing State v. Buggs, 995 S.W.2d 102, 105 (Tenn.1999)). Nor may an appellate court substitute its inferences for those drawn from the evidence by the trier of fact. Id. The trial judge and jury have the benefit of hearing the testimony of witnesses and of observing witness demeanor. Id. (citing Bolin v. State, 219 Tenn. 4, 405 S.W.2d 768, 771 (1966) and Carroll v. State, 212 Tenn. 464, 370 S.W.2d 523, 527 (1963)). We therefore defer to the determinations made by the trier of fact concerning witness credibility, factual findings, and the weight or value given to the evidence. Id. (internal citation omitted). When a jury renders a guilty verdict that is approved by the trial court, all conflicts are resolved in favor of the State, and we accredit the testimony of the State's witnesses. Id.

The jury as the trier of fact must evaluate the credibility of the witnesses, determine the weight given to witnesses' testimony, and reconcile all conflicts in the evidence. State v. Campbell, 245 S.W.3d 331, 335 (Tenn. 2008) (citing Byrge v. State, 575 S.W.2d 292, 295 (Tenn. Crim. App. 1978)). Moreover, the jury determines the weight to be given to circumstantial evidence, and the inferences to be drawn from this evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury. Dorantes, 331 S.W.3d at 379 (citing State v. Rice, 184 S.W.3d 646, 662 (Tenn. 2006)). When considering the sufficiency of the evidence, this court "neither re-weighs the evidence nor substitutes its inferences for those drawn by the jury." State v. Wagner, 382 S.W.3d 289, 297 (Tenn. 2012) (citing State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997)).

The record shows that, during the cross-examination, the Defendant questioned each of the State's witnesses about the prior inconsistent statements he now relies upon as the basis of his sufficiency of the evidence challenge in this appeal. The Defendant's challenge to the witnesses' credibility, therefore, was squarely presented to and rejected by the jury, as was their prerogative. State v. McKnight, 900 S.W.2d 36, 50 (Tenn. Crim. App. 1994), overruled on other grounds by State v. Collier, 411 S.W.3d 886 (Tenn. 2013). This court "neither re-weighs the evidence nor substitutes its inferences for those drawn by the jury." Wagner, 382 S.W.3d at 297. Moreover, the Defendant does not argue that the inconsistencies in the witnesses' testimony were inherently improbable and impossible of belief to require this court to intervene and declare it incredible as a matter of law. See Pinex v. State, No. M2009-00675-CCA-R3-CD, 2010 WL 759876, at *4-5 (Tenn. Crim. App. Mar. 5, 2010) (noting that the power to disregard oral testimony because of its inherent lack of believability is one that should be used sparingly and that when the testimony is capable of different interpretations, the matter should be left for the jury to decide as the sole arbiter of credibility). Accordingly, we conclude that the evidence, when viewed in a light most favorable to the State, was sufficient to establish the Defendant's

guilt for attempted second-degree murder and reckless endangerment by discharge of a firearm into an occupied habitation. The Defendant is not entitled to relief.

## **CONCLUSION**

Upon review, we affirm the judgments of the trial court.

s/ Camille R. McMullen

CAMILLE R. MCMULLEN, JUDGE